**McManimon, Scotland & Baumann, LLC**
427 Riverview Plaza
Trenton, New Jersey 08611
(973) 681-7979
Joseph R. Zapata, Jr., Esq. (jzapata@msbnj.com)
*Attorneys for Mark E. Dottore, Receiver*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>**MIGUEL L. LEMMING**,<br><br>           Debtor. | Case No. 25-22746 (CMG)<br><br>Chapter 13<br><br>Honorable Christine M. Gravelle, Chief Judge |
| **MARK E. DOTTORE, Receiver**,<br><br>           Plaintiff,<br><br>v.<br><br>**MIGUEL LEMMING**,<br><br>           Defendant. | Adv. Pro. No. _____ (CMG) |

## RECEIVER'S VERIFIED COMPLAINT

Plaintiff Mark E. Dottore, as the Receiver for the AEM Services, LLC *et al.* (the "**Receiver**"), for his complaint against Miguel Lemming (the "**Debtor**"), alleges the following:

### JURISDICTION, VENUE, CORE STATUS, AND STANDING

1. This Court has jurisdiction over the Bankruptcy Case and this adversary proceeding pursuant to 28 U.S.C. § § 1334 and 157(a).

2. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

3. As a creditor, the Receiver has standing to file this Complaint under FED. R. BANKR. P. 4007(a).

4919-5856-7823 v.1

4.      This complaint is brought under 11 U.S.C. §§ 523(a), and Rule 7001(1), (2), (6), and (9) of the Federal Rules of Bankruptcy Procedure, and is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (I), (K), and (O).

5.      Determination of the claims alleged in this complaint is within the Court's constitutional authority as analyzed by the United States Supreme Court in *Stern v. Marshall*, 564 U.S. 462 (2011).

**THE PARTIES**

6.      The Plaintiff is the Receiver of the AEM Services, LLC ("**AEM**"); AEM Investments, LLC; AEM Wholesale, LLC; AEM Productions, LLC; AEM Real Estate Group, LLC; AEM Capital Fund, Ltd.; A&J RE Holdings, LLC; and Landmark Property Development f/k/a Landmark Real Estate Endeavors [sic] (collectively, the "**Receivership Entities**").

7.      The Receiver was appointed pursuant to the order appointing receiver entered on June 22, 2022 in the Summit County Court of Common Pleas case styled *Christopher Longo v. The AEM Services, LLC, et al.*, bearing case number CV-2022-05-1754 (the "**Receivership Case**").

8.      Defendant Miguel Lemming is, and at all relevant times was, an individual residing in Burlington County, New Jersey.

**BACKGROUND FACTS:**
**THE DENTE-AEM PONZI SCHEME**

9.      In 2016, Mark Dente ("**Dente**") organized AEM and marketed it to investors as a real estate "wholesaling" company.

10.     Dente represented to potential investors that he had relationships with banks that wanted to offload distressed properties; and that he also had relationships with bona fide third-

2

party purchasers who wanted to purchase the contracts; and that he was uniquely positioned with these relationships to act as the matchmaker between them.

11.     These relationships, Dente claimed, put him in a unique position to quickly acquire contracts for the purchase of real estate, then sell them at a profit in a short time frame.

12.     Dente solicited investors' money to be used by AEM to pay for the real estate that AEM allegedly contracted to purchase from the banks.

13.     He described these opportunities as "wholesaling" real estate transactions (the "**Wholesale Transactions**").

14.     Investors who gave money directly to AEM usually received promissory notes from AEM Services, LLC which identified the amount invested, the term, and the "profit" promised.

15.     When individual promissory notes came due, AEM personnel would pressure investors to "roll over" their original principal investment, plus the promised profit identified in each note, into new notes.

16.     In fact, Dente never engaged in Wholesale Transactions whatsoever and AEM's alleged real estate wholesaling business was a sham.

17.     AEM did buy, renovate, and sell about 200 homes over the four years of its existence (the "**Flip Transactions**").

18.     AEM's renovation activities were funded by money AEM borrowed from an entity known as FTF Lending, LLC aka Fund That Flip ("**FTF**").

19.     The money borrowed from FTF was used to finance limited residential real estate purchases and the renovations to them, but these Flip Transactions resulted in AEM losing at least $28 million between 2018 to 2022.

3

20.     At the time the Receiver was appointed, AEM held title to only eighteen (18) parcels of real estate (the "**AEM Real Property**").

21.     The AEM Real Property was encumbered by FTF liens and the equity in the AEM Real Property was either non-existent or nominal in light of the investments made to AEM.

22.     The real-estate-purchase-contract rights AEM claimed it could turn around and sell at a higher price did not exist.

23.     AEM did not have any special relationships with banks or bona fide third-party purchasers.

24.     AEM did not generate revenue through real estate wholesaling transactions.

25.     Not a single real estate Wholesale Transaction worked the way Dente said it did.

### AEM'S BANKING ACTIVITY

26.     In July 2016, Dente opened the first bank account for AEM at Fifth Third Bank (the "**Fifth Third Account**").

27.     Additional accounts were opened at US Bank, Citizens Bank, and KeyBank, with the account at KeyBank becoming AEM's main account (the "**3937 Account**").

28.     Beginning in April 2017, Mark Dente made large, even-numbered deposits of money into AEM's bank accounts, given to him by investors who believed they were investing in AEM's Wholesale Transactions.

29.     Deposits were made into the Fifth Third Account in largely round numbers, as were withdrawals.

30.     For example, deposits for April 2017 totaled $541,357.34 (totaling only $37,914.00 the prior month), while withdrawals totaled $453,219.44.

4937-8660-1619, v. 1

31.     The amount of each deposit typically had a corresponding check or withdrawal in a slightly lesser amount, often on the same day.

32.     The pattern of large, round number deposits and withdrawals within each month continued in the Fifth Third Account until Dente ceased using it and began using accounts at other banks to run the Ponzi scheme.

33.     In January 2018, Dente opened the 3937 Account at KeyBank, where the bulk of the Ponzi scheme transactions occurred.

34.     The transactions AEM conducted in the KeyBank Account followed the same pattern as the Fifth Third Account transactions described above.

35.     Dente also opened bank accounts at US Bank and Citizens Bank for AEM and the Receivership Entities, between which funds were regularly transferred, but for which no accounting occurred.

36.     The pattern of large, round number deposits and withdrawals exhibited in the Fifth Third Account also occurred with bank accounts owned by AEM at KeyBank, Citizens Bank, and US Bank.

37.     Between January 2018 and June 2022, Dente and AEM raised at least $282 million and used it to defraud investors.

38.     Additional investor deposits and disbursements occurred through AEM's use of accounts owned by the other Receivership Entities.

39.     The collective AEM bank statements show that, beginning in April 2017, AEM used the overwhelming majority of new investors' money to pay older investors—often on the same day it was received.

5

40.     Simply put, Dente used AEM to operate a Ponzi scheme from April 2017 until the Receiver was appointed on June 22, 2022.

## PONZI SCHEME CHARACTERISTICS

41.     Dente's fraudulent business operations manifested all the earmarks of a garden-variety Ponzi scheme.

42.     AEM kept only sporadic and incomplete books and records and neither filed nor paid any taxes.

43.     The books and records that the Receiver was able to obtain were incomplete and atypical of a legitimate business enterprise.

44.     Dente freely and liberally commingled AEM investor-victim funds with those of the Receivership Entities, his family members, friends, and business associates.

45.     He encouraged investors whose notes had matured to "let it ride," and make even more money by investing in new "opportunities."

46.     The investor money was never actually invested.

47.     Dente used new investor money to pay earlier investors their promised returns, overhead for AEM like rent and supplies, exorbitant salaries to AEM executives, and fees to finders that facilitated new investments.

48.     Dente siphoned off the rest for himself and his family, paying out "salaries" and "investment returns" to accomplices who helped him perpetrate the fraud.

49.     Dente's extravagant lifestyle—financed by AEM investors—featured lavish home improvements, a vacation home, luxury cars, country club dues, and large cash withdrawals.

50.     When investors wanted to cash out and threatened the continuation of the Ponzi scheme, Dente offered them even higher rates of interest.

6

4937-8660-1619, v. 1

51.     The Ponzi scheme collapsed in April 2022 when new investors could not be found to keep the scheme afloat with new cash infusions, and investors began to file lawsuits on the notes issued by AEM.

### THE RECEIVER'S INVESTIGATION

52.     The Receiver was appointed over the Receivership Entities on June 22, 2022.

53.     The order appointing the Receiver entered on June 22, 2022 in the Receivership Case was amended on July 15, 2022, August 11, 2022, and November 2, 2022, resulting in the Operative Receiver Order, a copy of which is attached as Exhibit 1.

54.     The Receiver found that Dente did not maintain adequate books and records for AEM and/or caused the majority of AEM's books and records to be destroyed.

55.     To investigate the fraud conducted by Dente through the Receivership Entities, the Receiver employed a forensic accountant, David Linscott, CPA, ("**Mr. Linscott**"), to reconstruct the financial affairs of the Receivership Entities using objective sources such as bank records.

56.     Mr. Linscott used the bank statements and copies of checks from the accounts used by the Receivership Entities to evaluate the financial condition of AEM and the Receivership Entities.

57.     Mr. Linscott ultimately concluded that Dente was operating a Ponzi scheme using AEM and the other Receivership Entities from April 2017 (and perhaps earlier) through its collapse in mid-2022.

58.     Mr. Linscott prepared a report of his findings and conclusions (the "**Linscott Ponzi Report**"), a copy of which is attached as Exhibit 2 and incorporated herein by this reference.

59.     In addition to authoring the Linscott Ponzi Report, Mr. Linscott identified more than 300 individuals to whom AEM fraudulently transferred money.

60. The Debtor is among those individuals who received more money from AEM than he invested in AEM.

## THE STATE COURT LITIGATION

61. On August 6, 2024, the Receiver filed a complaint against the Debtor in the Summit County Court of Common Pleas styled *Mark E. Dottore, Receiver v. Miguel Lemming*, and assigned case number CV-2024-08-3391, (the "**State Court Case**"), a copy of which is attached as Exhibit 3.

62. The State Court Case seeks to avoid and recover $318,705.15 in transfers made from the Receivership Entities to the Debtor pursuant to R.C. § 1336.01 *et seq.* (the "**Ohio UFTA**"), each of which was made for the Debtor's benefit.

63. In exchange for money invested by the Debtor in AEM, AEM issued several short-term cognovit promissory notes to the Debtor, identifying a sum certain as "profit" and the maturity date (the "**Promissory Notes**").

64. Between August 23, 2017 and April 4, 2022, AEM made multiple transfers of money to the Debtor totaling $318,705.15, as follows:

    a.    On 8-23-17 by check from Fifth Third for[1] $1,667.00;

    b.    On 8-23-17 by check from Fifth Third for $7,750.00;

    c.    On 8-23-17 by check from Fifth Third for $9,000.00;

    d.    On 10-30-17 by check from Fifth Third for $1,667.00;

    e.    On 11-28-17 by check from US Bank for[2] $50,000;

---

[1] The phrase "from Fifth Third for" as used in this Complaint means a check drawn on or a wire transfer deducted from the Fifth Third Bank account owned by AEM having the account number ending in x0247, in the amount identified.

[2] The phrase "from US Bank for" as used in this Complaint means a check drawn on or a wire transfer deducted from the US Bank account owned by AEM having the account number ending in x0179, in the amount identified.

4937-8660-1619, v. 1

f.   On 12-13-17 by wire from US Bank for $16,750.00;

g.   On 1-3-18 by check from US Bank for $410.66;

h.   On 1-9-18 by check from US Bank for $410.67;

i.   On 1-22-18 by check from KeyBank[3] for $821.33;

j.   On 2-26-18 by check from Citizens Bank[4] for $1,667.00;

k.   On 4-23-18 by check from KeyBank for $1,667.00;

l.   On 5-2-18 by check from Citizens Bank for $5,950.00;

m.   On 6-19-18 by check from Citizens Bank for $7,000.00;

n.   On 7-2-18 by check from US Bank for $3,500.00;

o.   On 7-9-18 by check from Citizens Bank for $834.00;

p.   On 7-24-18 by check from KeyBank for $834.00;

q.   On 8-21-18 by check from US Bank for $9,000.00;

r.   On 9-23-18 by check from KeyBank for $12,750.00;

s.   On 11-12-18 by check from US Bank for $821.33;

t.   On 11-26-18 by check from KeyBank for $1,667.00;

u.   On 12-14-18 by check from KeyBank for $8,500.00;

v.   On 1-25-19 by wire from KeyBank for $11,821.33;

w.   On 3-1-19 by check from KeyBank for $821.33;

x.   On 4-3-19 by check from US Bank for $821.34;

y.   On 4-8-19 by check from KeyBank for $17,250.00;

---

[3] The phrase "from KeyBank for" as used in this Complaint means a check drawn on or a wire transfer deducted from the 3937 Account, in the amount identified.

[4] The phrase "from Citizens Bank for" as used in this Complaint means a check drawn on or a wire transfer deducted from the Citizens Bank account owned by AEM having the account number ending in x4573, in the amount identified.

9

z. On 4-27-19 by check from KeyBank for $821.34;

aa. On 5-27-19 by check from KeyBank for $821.34;

bb. On 6-28-19 by check from KeyBank for $821.34;

cc. On 7-26-19 by check from KeyBank for $821.34;

dd. On 8-21-19 by check from KeyBank for $7,500.00;

ee. On 8-27-19 by check from KeyBank for $821.34;

ff. On 9-29-19 by check from KeyBank for $821.34;

gg. On 10-10-2019 by check from KeyBank for $5,000.00;

hh. On 11-3-2019 by check from KeyBank for $821.34;

ii. On 11-7-19 by check from KeyBank for $13,250.00;

jj. On 11-14-19 by check from KeyBank for $25,000.00;

kk. On 12-7-19 by check from KeyBank for $821.34;

ll. On 1-3-20 by check from KeyBank for $821.34;

mm. On 1-4-20 by check from KeyBank for $12,000.00;

nn. On 1-12-20 by check from KeyBank for $27,000.00;

oo. On 1-28-20 by check from KeyBank for $21,000.00;

pp. On 2-10-20 by check from KeyBank for $8,323.00;

qq. On 3-10-20 by wire from KeyBank for $821.34;

rr. On 4-3-20 by wire from KeyBank for $821.34;

ss. On 5-1-20 by wire from KeyBank for $5,000.00;

tt. On 5-21-20 by wire from KeyBank for $821.34;

uu. On 5-29-20 by wire from KeyBank for $821.34;

vv. On 6-26-20 by wire from KeyBank for $821.34;

10

ww.    On 7-31-20 by wire from KeyBank for $821.34;

xx.    On 7-31-20 by wire from KeyBank for $5,000.00;

yy.    On 8-28-20 by wire from KeyBank for $821.34;

zz.    On 9-28-20 by wire from KeyBank for $821.34;

aaa.    On 10-28-20 by wire from KeyBank for $821.34;

bbb.    On 11-2-20 by wire from KeyBank for $5,000.00;

ccc.    On 12-21-20 by wire from KeyBank for $823.00;

ddd.    On 12-21-20 by wire from KeyBank for $821.34;

eee.    On 1-5-21 by wire from KeyBank for $11,250.00;

fff.    On 1-29-21 by wire from KeyBank for $821.34;

ggg.    On 2-2-21 by wire from KeyBank for $5,000.00;

hhh.    On 3-17-21 by wire from KeyBank for $21,250.00;

iii.    On 9-9-21 by wire from KeyBank for $821.34;

jjj.    On 11-9-21 by wire from KeyBank for $821.34;

kkk.    On 1-6-22 by wire from KeyBank for $5,000.00;

lll.    On 1-7-22 by wire from KeyBank for $1,642.68;

mmm. On 4-4-22 by wire from KeyBank for $7,466.00

(each a "**Transfer**" and collectively, the "**Transfers**").

65.    On May 12, 2025, the Debtor filed an answer in the State Court Case.

66.    Following discovery, the Judge in the State Court Case issued a Case Management

Order on November 4, 2025, *inter alia*, setting the case for trial beginning on January 5, 2026.

11

4937-8660-1619, v. 1

67.    On November 6, 2025, pursuant to that order, the Receiver filed a partial motion for summary judgment in the State Court Case seeking a determination that AEM was operated as a Ponzi scheme (the "**Partial MSJ**").

68.    On December 1, 2025, the Debtor filed his voluntary chapter 13 petition at 2:20:06 p.m. (the "**Petition Date**").

69.    The State Court Case granted the Partial MSJ by order entered on December 1, 2025 at 5:45:38 p.m., a copy of which is attached as Exhibit 4.

70.    On January 3, 2026, the Receiver timely filed his proof of claim (Claim No. 2) in the amount of $371,197.00.

## FACTS COMMON TO ALL COUNTS

71.    Dente was the primary operator of the Receivership Entities, which were collectively a sham business that did not generate sufficient revenue to be considered a legitimate business or going concern.

72.    Dente misrepresented to investors the actual financial status of the Receivership Entities in order to sell investments in AEM while offering unrealistic returns of investments by way of promissory notes.

73.    Through AEM, Dente used subsequent investor funds to repay earlier investors, instead of applying subsequent investor funds to legitimate business purposes.

74.    Dente operated AEM and the Receivership Entities as a Ponzi scheme from April 2017 through June 2022 (the "**Dente/AEM Ponzi Scheme**").

75.    The Dente/AEM Ponzi Scheme was insolvent from its inception.

76.    As the principal operator of the Dente/AEM Ponzi Scheme, Dente made the Transfers to the Debtor with the actual intent to hinder, delay, or defraud AEM's creditors.

12

4937-8660-1619, v. 1

77.    Dente made each transfer from AEM to investors, including the Debtor, with the actual intent to defraud creditors because he knew that:

a.    AEM never conducted any Wholesale Transactions or else such Wholesale Transactions did not produce enough money to pay the amounts due to investors;

b.    AEM's Flip Transactions did not produce enough money to pay the amount due to investors;

c.    the only source of funds available to pay funds to the Debtor (and AEM's other investors) was new money from new investors;

d.    AEM was never solvent;

e.    AEM did not conduct enough legitimate business to pay investors the "profit" promised by the promissory notes;

f.    Every promissory note issued by AEM made AEM more insolvent;

g.    Every transfer by AEM to investors made AEM more insolvent.

78.    Upon a finding that AEM operated as a Ponzi scheme:

a.    AEM's actual intent to defraud is established as a matter of law;

b.    AEM is determined to have been insolvent as a matter of law from its inception; and

c.    Every transfer made by AEM to investors is deemed fraudulent under the Ohio UFTA as a matter of law.

79.    From the inception and at the time of each Transfer, the Debtor was aware of facts that should have made him ask questions about the legitimacy of AEM's business operations.

4937-8660-1619, v. 1

80. The high interest rate of the Promissory Notes put the Debtor on inquiry notice that AEM's business was illegitimate.

81. The Debtor invested in AEM without conducting any due diligence on Dente or AEM, or alternatively, such inquiries as the Debtor made were not the commensurate with the inquiries of a reasonably prudent investor under the totality of circumstances.

82. AEM did not make all payments as required by the Promissory Notes.

83. AEM did not make timely payments to the Debtor under the Promissory Notes.

84. The amounts and dates of payments from AEM to the Debtor did not coincide with the terms of his Promissory Notes.

## COUNT I
### Nondischargeability

85. The Receiver repeats and incorporates by reference all the allegations contained in the preceding paragraphs of his Complaint as if fully rewritten herein.

86. The Debtor is an individual debtor.

87. The debt that the Debtor owes to the Receiver is for money the Debtor obtained by actual fraud under 11 U.S.C. 523(a)(2)(A).

88. For each Transfer from AEM to the Debtor, Dente acted with the actual intent to defraud AEM's creditors because AEM was a Ponzi scheme.

89. Each Transfer from AEM to the Debtor is money that belongs *pro rata* to the creditor-victims of the AEM/Ponzi Scheme.

90. AEM was insolvent at the time it made each of the Transfers to the Debtor.

91. At the time it made the Transfers to the Debtor, AEM was insolvent as a matter of law because AEM was a Ponzi scheme.

92. The Debtor was the first transferee of each of the Transfers.

14

4937-8660-1619, v. 1

93.    Each of the Transfers was made to or for the benefit of the Debtor because they collectively gave the Debtor $318,705.15 more than he invested in AEM.

94.    The Debtor owes a debt to the Receiver in the amount received from AEM as actual fraudulent transfers under the Ohio UFTA.

95.    As the recipient of multiple fraudulent transfers from AEM, the Debtor owes the sum of $318,705.15 to the Receiver under the Ohio UFTA.

96.    The debt owed by the Debtor to the Receiver was obtained by the actual fraud of Dente in operating the Dente/AEM Ponzi Scheme.

97.    The actual fraud of Dente is established as a matter of law by a finding that AEM and the Receivership Entities operated as a Ponzi scheme.

98.    The debts owed by the Debtor to the Receiver is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

**WHEREFORE**, the Receiver prays that this Court enter judgment declaring that the debt owed by the Debtor to the Receiver is nondischargeable under 11 U.S.C. § 523(a)(2) in the amount of $318,705.15, and for such other and further relief as the Court deems just and equitable.

Respectfully submitted,

**MCMANIMON, SCOTLAND & BAUMANN, LLC**
*Attorneys for Mark E. Dottore, Receiver*

By:____*/s/ Joseph R. Zapata, Jr.*_____

Dated: March 2, 2026                    JOSEPH R. ZAPATA, JR.

15

4937-8660-1619, v. 1

## VERIFICATION

I, Mark E. Dottore, as Receiver of the Receivership Entities, declare under penalty of

perjury that the facts alleged in the foregoing Complaint are true and correct.


Executed March 2, 2026


*/s/ Mark E. Dottore*
Mark E. Dottore, Receiver for the
Receivership Entities

16

4937-8660-1619, v. 1